PETER PROWS (257819)
NICOLE KIM (357392)
BRISCOE IVESTER & BAZEL LLP
235 Montgomery Street, Suite 935
San Francisco, CA 94104
Tel (415) 402-2700
pprows@briscoelaw.net
nkim@briscoelaw.net

Attorneys for Plaintiffs
NICOLETTE HAHN NIMAN and WILLIAM NIMAN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICOLETTE HAHN NIMAN and WILLIAM NIMAN,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, DOUG BURGUM, in his capacity as Secretary of the United States Department of the Interior, UNITED STATES NATIONAL PARK SERVICE, and JESSICA BOWRIN, in her capacity as Acting Director of the National Park Service,<br><br>Defendants. | No.<br><br>**COMPLAINT** |

1

**INTRODUCTION**

1.  The Point Reyes peninsula in Marin County has been in ranching and agriculture for about 200 years—since well before California became a State. The produce, meat, and dairy produced in Point Reyes is recognized as some of the finest in the world. Point Reyes is, and can continue to be, a model for healthy, sustainable, environmentally beneficial, regenerative ranching and agriculture. Congress established the Point Reyes National Seashore in part to preserve its ranching and agricultural heritage, and specifically authorized Defendants to allow those uses to continue even if the original ranchers and farmers decide to leave. Defendants, however, have refused to consider allowing farming and ranching to continue in Point Reyes on the lands previously worked by the farmers and ranchers who recently decided to leave. Defendants' refusal to consider allowing farming and ranching to continue, even though Congress has specifically authorized Defendants to do so, violates the law and will cause significant and irreparable harm to this agricultural heritage, to the environment, to the community, to the regional food supply, and to the health of the nation. This Court should correct Defendants' violations of the law and prevent the harms their actions are causing.

**JURISDICTION**

2.  This Court has jurisdiction over this action pursuant to 5 U.S.C. § 702 (judicial review of agency action); 42 U.S.C. §§ 4321, et seq. (National Environmental Policy Act); 16 U.S.C. § 1456 (Coastal Zone Management Act); and 28 U.S.C. § 1331 (civil action arising under the laws of the United States).

3.  Plaintiffs timely submitted comments during the NEPA process, where and when such comments were allowed, thereby exhausting all administrative remedies and satisfying their duties under NEPA before filing this suit. There is no available administrative appeal from the decision challenged here.

4.  Venue properly lies in this court under 28 U.S.C. § 1391(e), since all defendants are officers or employees, or agencies, of the United States, a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this judicial district, and the property that is the subject of this action is situated in this judicial district.

**DIVISIONAL ASSIGNMENT**

5.      Pursuant to Civil Local Rule 3-2(d), there is a basis for assigning this civil action to the San Francisco Division, as a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in Marin County, California, and Plaintiffs reside and do business in Marin County, California.

**PARTIES**

6.      Plaintiffs Nicolette Hahn Niman and William Niman (the Nimans or Niman family) are a husband and wife ranching team who, together with their two sons, raise grassfed cattle and heritage breed chickens on a ranch and residence in the Point Reyes National Seashore (known by NPS as allotments 31a and 31b, or the "Niman RUO" and "Commonweal"). They sell their meat locally throughout the Bay Area, and advocate nationally and internationally for regenerative farming practices, especially for well-managed grazing, and for the importance of animal-derived foods in the human diet. Bill is the founder of the sustainable meat company, Niman Ranch, and co-founder of a grassfed beef and pasture-raised poultry company. Nicolette worked previously as the Senior Attorney for the environmental organization Waterkeeper Alliance, where she led the group's campaign to reform the livestock industry. She is co-founder of BN Ranch and author of two books about sustainable meat production, *Righteous Porkchop: Finding a Life and Good Food Beyond Factory Farms*, and *Defending Beef: The Case for Sustainable Meat Production*, as well as numerous articles and op-eds about ecological food production in *The New York Times*, *The Wall Street Journal*, *The Atlantic*, *The Los Angeles Times*, *The Earth Island Journal*, and many other publications. The Nimans are not parties to the recent settlement agreement with The Nature Conservancy in which most other Point Reyes ranchers voluntarily agreed to a buyout and departure from their leases on Pt. Reyes.

7.      Plaintiffs have spent years working to protect sustainable and responsible ranching and agriculture in Point Reyes National Seashore, adjacent areas in Marin County, and across the country, whether practiced by themselves or by others. Plaintiffs' interest in sustainable and responsible ranching and agriculture, whether practiced by themselves or by others, is directly harmed by the decisions challenged in this complaint.

8. Defendants' violations of law alleged in this complaint have injured and will continue to injure the aesthetic, conservation, scientific, recreational, educational, economic, historic, cultural, environmental, procedural, nutritional, and other interests of Plaintiffs. Defendants' decision to not offer historic ranching and agricultural lands for continued ranching and agriculture, and to constrain the options available to Plaintiffs for continued ranching and agriculture on their ranches, harms Plaintiffs' use and enjoyment of Point Reyes and the adjacent agricultural lands in Marin County. The decision to not offer such lands for continued ranching and agriculture prevents Plaintiffs and other members of the public from accessing and enjoying the pastoral qualities of the Seashore that Congress sought to protect. These are actual, concrete injuries caused by Defendants' violations of law, and the judicial relief sought would remedy, in whole or in part, these injuries. Plaintiffs have no other adequate remedy at law.

9. Defendant Doug Burgum is the Secretary of the U.S. Department of Interior, an agency of the United States. He is named as a defendant in his official capacity.

10. Defendant U.S. Department of the Interior is an agency of the United States, within the meaning of 5 U.S.C. § 701(b), charged with managing the public lands and resources in accordance with and in compliance with federal laws and regulations.

11. Defendant Jessica Bowrin is the Acting Director of the U.S. National Park Service, an agency of the United States. She is named as a defendant in her official capacity.

12. Defendant U.S. National Park Service (NPS) is an agency of the United States, within the meaning of 5 U.S.C. § 701(b), charged with managing the public lands and resources in accordance with and in compliance with federal laws and regulations.

## BACKGROUND

### Facts

13. Point Reyes was initially studied as a national park site in the 1930s, but efforts did not get serious until the 1950s, when NPS Regional Chief of Recreation and Planning George Collins spearheaded a drive to create the National Seashore.

14. As a Seashore, the primary focus was to provide recreation opportunities close to the metropolitan Bay Area, but even in the earliest discussions, a key concern was the possible effects of

4

establishing a park on the local agricultural economy. As early as 1958, in a letter to Senator Clair Engle (one of the initial sponsors of the legislation), then-president of Marin Conservation League Caroline Livermore wrote: "As true conservationists we want to preserve dairying in this area and will do what we can to promote the health of this industry which is so valuable to the economic and material well being of our people and which adds to the pastoral scene adjacent to the proposed recreation project." Letter from Mrs. Normal B. Livermore to Hon. Clair Engle, July 28, 1958, Anne T. Kent California Room, Marin County Library.

15. In 1960, California Senator Clair Engel and Representative Clem Miller introduced legislation to create a new "national seashore" in Point Reyes, with a design that would retain existing agricultural uses even under federal ownership. California's other Senator, Thomas Kuchel, described the "novel" concept as one to "maintain the character" of the "historic" area in the "public interest", which included protecting the historic ranches. House Hearing [etc.] on S.2428, 86th Congress, 2d Session (April 14, 1960).

16. In 1961, NPS incorporated these concepts into planning documents for the Point Reyes National Seashore. NPS explained that land uses in a national seashore should be "less restrictive" than in a national park. NPS proposed that "about half the dairy and beef cattle ranches would continue operation under lease agreements" so as to "preserve" the "scenic pastoral qualities" of that portion of the seashore. National Park Service, Proposed Point Reyes National Seashore: Land Use Survey & Economic Feasibility Report (February 1961).

17. Later that year, the Secretary of the Department of the Interior, Stuart Udall, testified to Congress that "[m]ost of the dairy ranches could continue operation" and would "provide both recreation and economic value to the seashore." Senate Hearing [etc.] on S.476 ("A Bill To Establish The Point Reyes National Seashore In The State Of California, And For Other Purposes"), 87th Congress, 1st Session (March 28, 30, 31, 1961).

18. In 1962, Congress adopted NPS's proposals by passing the Point Reyes National Seashore Act. Pub. L. No. 87-657, 76 Stat. 538 (1962), codified at 16 U.S.C. §§ 459c et seq. The purpose of that Act was to "save and preserve, for purposes of public recreation, benefit, and inspiration, a portion of the diminishing seashore of the United States that remains undeveloped." 16

U.S.C. § 459c. The House Report accompanying this legislation recognized that the "expanses of pasturelands" played an important role "in preserving the beauty of the area." H. Rep. 87-1628. No one testified at any time in favor of shutting down existing ranching, dairying, or farming operations. Instead, the legislation reflected a strong commitment to retaining and sustaining existing agricultural uses, as they served the public recreational, inspirational, and other beneficial purposes that the new national seashore was created to save and preserve.

19. After the establishment of the Point Reyes National Seashore, and the acquisition (under threat of eminent domain) by the federal government of the lands there, the Department of the Interior, through the National Park Service, authorized agricultural and ranching activities to continue. National Park Service, D.S. (Dewey) Livingston (1993), *Ranching On The Point Reyes Peninsula: A History of the Dairy and Beef Ranches Within Point Reyes National Seashore, 1834-1992*, at pp. v, 298, 346.

20. In 1976, Congress passed a law relating to tule elk in California, including Point Reyes. Pub. L. 94-389 (1976). The Secretary of the Department of the Interior has not complied with his obligations under that law, as further described below.

21. In 1978, Congress amended the 1962 Act to make clear that the Secretary of the Interior has authority to lease, for agricultural or other purposes consistent with the 1962 Act, any federally owned lands in the Point Reyes National Seashore that was agricultural land prior to the federal government's acquisition. Pub. L. 95-625 § 318, amending 16 U.S.C. § 459c-5(a). The only condition is that such lands be offered first to those ranchers who owned the land at the time the federal government acquired it. *Id.* **Even if those original ranchers ever decided to leave Point Reyes, the Secretary of the Interior still has the express statutory authority to lease those lands to a new generation of farmers and ranchers.**

22. In July 2017, the Acting Superintendent of the Seashore nominated for inclusion on the National Register of Historic Places the Point Reyes Dairy Ranches Historic District. The Point Reyes Dairy Ranches Historic District is comprised of 17 ranch areas and covers most of the Point Reyes Peninsula. (The Niman ranch is not included within this Historic District.)

23. The Point Reyes Dairy Ranches Historic District is listed as historically significant

because of its association with the history of dairy ranching in Marin County from the mid-1800s through the 1950s and because it contains buildings and structures that reflect that history.

24. NPS then initiated a process to update its general management plan for the Seashore.

25. In support of that update, NPS published a draft environmental impact statement (EIS) under the National Environmental Policy Act (NEPA) in August 2019, and a final EIS in September 2020 (2020 EIS) that studied six alternatives for managing the Seashore.

26. None of the alternatives examined in the 2020 EIS studied leasing lands within the Seashore for agricultural or ranching purposes to people other than those currently farming or ranching those lands, so that farming and ranching could continue even if those currently working such lands elected to leave, despite Congress expressly authorizing such leases. 16 U.S.C. 459c-5(a).

27. The Nimans submitted comments on the draft 2020 EIS and general management plan update process. They supported continued ranching in the Seashore.

28. The Niman comment letter explained their interest in "keeping agriculture in the Seashore" as follows:

> Regenerative Agriculture is the Future
>
> Much of the criticism launched at the National Park Service for allowing ranching to continue in the Seashore has suggested that agriculture, especially of animals, is inherently destructive and extractive, often also suggesting that we all know we should be eating less dairy and meat. Implicitly these people argue that the world, in general, as well as the Seashore, specifically, would be a better place if there were fewer people raising livestock. We vigorously refute every aspect of these claims. They vastly oversimplify complex questions of diet, health, and the environment and ignore the vital role local farm people play in communities. In truth, farmers and ranchers can and must be essential allies in the burgeoning movement to re-make our food system into one that produces healthy, nutrient rich food and is ecologically regenerative. And while there are people whose health might benefit from reducing their meat consumption there are others whose health would improve if they ate more meat.
>
> These critics dismiss regenerative agriculture as impractical, unfeasible, or even impossible. Animal rights activists, and conventional agriculture and its allies - - fossil fuel and chemical companies, big food companies, and the pharmaceutical industry - - all want people to believe this. But ranchers in the Seashore and elsewhere are demonstrating that regenerative agriculture is not only real it is also the most financially viable and ecologically sound option

for the food system. Successful real world examples of regenerative agriculture with livestock have been set forth in great detail by Gabe Brown in *Dirt to Soil* (2018), David Montgomery in *Growing a Revolution* (2017), Charles Massy in *Call of the Reed Warbler* (2018), among many others, which powerfully demonstrate the potential for widespread adoption of regenerative practices.

The best regenerative agriculture models, including many of the ranches in the Seashore, have strong connections to surrounding communities. In her several books and her film, *The Economics of Happiness*, Helena Norberg-Hodge urges that the most important thing people can do to protect the earth is to re-localize our economies, including with respect to food and farming. It is our very disconnectedness from our surrounding landscapes, our alienation from the people around us, and from the sources of our food and fiber that causes so many modern ills, Norberg-Hodge contends. Vibrant health - both mental and physical - is closely related to our connectedness to the people, community, and nature surrounding us. Keeping agriculture in the Seashore maintains a longstanding intricately woven community fabric in West Marin between humans, animals, nature, and our food. The people who live and work on these ranches not only generate our food they are members of our churches and civic clubs, have children at our schools and on our soccer teams, and frequent our local businesses. They are vital to our community cohesion.

Ranches are equally important to this region's environment; animal impact is essential to ecosystem function.

According to an ecology textbook used at UC Berkeley, *California Grasslands: Ecology and Management,* 6,000 years ago California was home to some 19 species of browsing and grazing creatures. They, together with other large beasts who preyed on them, created and maintained California's vast open areas and diverse, biologically active soils. Without the once-abundant large predators, (which included grizzlies, wolves, lions, and tigers), it is no longer feasible for this urban-fringe area to maintain significant populations of large wild grazing animals. Domesticated grazing animals, however, can serve as the proxies for those disappeared wild grazers and browsers. Indeed, for this ecosystem to function at its best, large populations of grazing animals are necessary.

A large body of scientific evidence shows that grazing, including by cattle, enhances biodiversity, from soil micro-organisms to megafauna. Grazing animals' hooves help press seeds into the soil, their mouths clip vegetation, stimulating plant growth and helping later-sprouting species of plants to germinate, and their manure and urine provide nutrients, moisture, and organic matter that help soil biology. For example, a long-term study by University of Nebraska researchers published in 2004 found more plant diversity in areas with grazing than in areas where grazing had been excluded. The 2016 textbook by Stanford biology professor Harold Mooney, *Ecosystems of California* states: 'A growing body of research shows that livestock grazing

can enhance biodiversity. To a surprising degree, this research comes from cases in which, as part of conservation efforts, livestock grazing was removed, and subsequently, species or habitats of interest disappeared.'

Grassland birds are among the most rapidly disappearing of all types of wildlife, largely because of losses of farming and ranching land and convers[i]on of grazing areas to croplands. Work by Audubon Society, Point Blue and others have shown that well-managed ranches are essential partners i[n] stemming the decline of bird populations. For example, recent analyses show how grazing benefits bird populations. See, e.g. 'What's good for the herd is good for the bird,' Beef Magazine in 2019.

Some have urged that the greenhouse impact of livestock alone warrants getting rid of the Seashores ranches. But livestock's connection to climate change has been wildly mis-stated by various interest groups who are using climate change to advance their own agendas. Animal rights groups and some environmental groups have claimed that changing your diet (by reducing or eliminating beef) is the single most important thing you can do to help the climate. In the particularly ridiculous film Cowspiracy, the utterly specious claim was even made that more than half of greenhouse gases come from cattle. According to the U.S. Environmental Protection Agency, however, the real number is around 2 - 3% for all grazing animals (including cattle, sheep, goats, bison, and yaks).

While it is both admirable and valuable for Americans to make wise personal daily choices, those decisions have far less impact on the climate than does US policy. This point has been made repeatedly by climate leaders like Bill McKibben, and is explained by David Wallace-Wells in his recent book, *The Uninhabitable Earth: Life After Warming* (2019). Wallace-Wells calls personal dietary choices a drop in the bucket. (See interview with William Branghan, PBS, March 1, 2019).

The true impact of beef related to climate is much more accurately understood when compared with other foods.

The work of Dr. Michael Lee (Head of Sustainable Agriculture Sciences, Rothamsted Research, UK) shows that when the nutritional value of food is considered, beef has a comparatively small climate impact.

Most important, recent peer-reviewed research strongly supports the case made in *Defending Beef* that well-managed grazing provides myriad ecosystem services, even including a net benefit to the climate by sequestering large amounts of atmospheric carbon. This research includes the following:

*Journal of Soil and Water Conservation*, April 2016: A collection of well-known rangeland experts, sustainable agriculture experts, and soil scientists assemble to argue that good grazing builds soil carbon, removes substantial carbon from the atmosphere, and is better for the climate than crop

production. They estimate 1.2 tons of carbon per acre per year (1.2 tC/ac/yr) drawdown via properly-managed grazing, and that the drawdown potential of North American rangelands and pasturelands is 800 million tons (megatonnes) of carbon per year (800 MtC/yr).

Most interestingly, the authors show that if crop production were replaced with well-managed grazing the greenhouse gas emissions of agriculture would actually decline. Teague, W. R., Apfelbaum, S., Lal, R., Kreuter, U. P., Rowntree, J., Davies, C. A., R. Conser, M. Rasmussen, J. Hatfield, T. Wang, F. Wang, Byck, P. (2016). The role of ruminants in reducing agriculture's carbon footprint in North America. *Journal of Soil and Water Conservation*, 71(2), 156-164. doi:10.2489/jswc.71.2.156
http://www.jswconline.org/content/71/2/156.full.pdf.html

*University of Georgia study, May 2015: Finds 3.6 tons of carbon per acre per year (3.6 tC/ac/yr) drawdown following a conversion from row cropping to regenerative grazing. https://news.uga.edu/farmland-management-changes-boost-carbon-sequestration-rates-0515/

*May 2019, study of Georgia farm (White Oak Pastures in Blufton, GA) shows well-managed beef operation having negative carbon footprint: https://www.prnewswire.com/news-releases/study-white-oak-pastures-beef-reduces-atmospheric-carbon-300841416.html

* *Nature* article, April 2015, summarizing studies showing carbon sequestration in ag soils from good management, including management-intensive grazing. Machmuller, M. B., Kramer, M. G., Cyle, T. K., Hill, N., Hancock, D., & Thompson, A. (2015). Emerging land use practices rapidly increase soil organic matter. Nature Communications, 6, 6995. doi:10.1038/ncomms7995 https://www.nature.com/articles/ncomms7995

* 2018 study by Michigan State University finds that well-managed grassfed cattle sequester enough carbon in soils to offset all of their GHG emissions (including methane), i.e. 1.5 tons of carbon per acre per year (1.5 tC/ac/yr) drawdown. Stanley, P. L., Rowntree, J. E., Beede, D. K., DeLonge, M. S., & Hamm, M. W. (2018). Impacts of soil carbon sequestration on life cycle greenhouse gas emissions in Midwestern USA beef finishing systems.

Agricultural Systems, 162, 249-258.
doi:https://doi.org/10.1016/j.agsy.2018.02.003

Finally, while we recognize it's not central to the National Park Services decision-making process, it should be noted that Seashore ranches are providing exceptionally wholesome, nutrient rich foods at a moment in history when they are desperately needed. Our nation's healthcare system is literally collapsing under the strain of a population that is plagued with diet-related diseases. Meat, milk, yogurt, cheese and eggs are among the most nutritionally valuable foods. Almost a century ago, in his seminal work,

*Nutrition and Physical Degeneration* (originally published in 1939, 23d printing, 2009), Dr. Weston Price, meticulously documented how humanity's adoption of processed foods and abandonment of traditional foods - especially those from animals - was leading to widespread declines in human health. Modern Americans increasingly depend on pills, powders and potions for their nutrients. In contrast, beef, (especially organ meats), butter, milk, yogurt, and cheese are exceptionally nutrient rich foods that support vibrant health. More specifically, all of the dairies in the Seashore are organic and grass-based; many of the meat and egg operations are grassfed. Grass-based meat, dairy, and eggs, such as those produced in the Seashore, are rich in vitamin K2, a nutrient found only in animal-based foods where animals are raised on grass. Today, K2 is extremely scarce in foods due to our nation moving animals off pastures into confinement systems. The absence of K2 in our diets has contributed to high levels of many serious health problems in our population, including heart disease and osteoporosis. (For more on this topic, see: Dr. Kate Rheaume-Bleue's groundbreaking book *Vitamin K2 and the Calcium Paradox* (2013), and Dr. Cate Shanahan's *Deep Nutrition* (2016)).

Conclusion

For these and many other reasons, we urge that the General Management Plan Amendment reflect a National Park Service commitment to the long-term continuation and support of the Seashores ranches. Remember, It's not the COW, it's the HOW.

29. In September 2021, NPS issued a decision (2021 ROD) that updated the Seashore's general management plan to authorize continued ranching for at least the next 20 years, and potentially much longer, by the existing ranching families on the Seashore, on most or all of the ranches within the Seashore's Pastoral Zone.

30. Because the 2021 ROD was a "federal activity", the federal Coastal Zone Management Act, 16 U.S.C. § 1456(c)(1), required NPS to obtain the California Coastal Commission's concurrence that the 2021 ROD was consistent to the maximum extent practicable with the California Coastal Act. The California Coastal Commission concurred, with conditions (mainly related to water quality issues). In reaching this conclusion, the California Coastal Commission noted that the California Coastal Act supports continued agricultural uses in the coastal zone, and that converting ranch lands to other uses would raise "concerns" under the California Coastal Act:

> Maintaining existing, long-standing ranch operations is consistent with the Coastal Act's policies that prioritize agricultural uses and seek to maintain

agricultural economies. Alternatively, removal of all ranch operations in the [General Management Plan Amendment] planning area would result in a significant, negative spillover effect on the agricultural economy of Marin County, particularly for the dairy-related component. In such a case, agricultural products would no longer be available from ranches within the GMPA, and agricultural-related businesses elsewhere in Marin County would no longer be supported by the ranches on the GMPA. Converting these ranch lands to other uses would also raise concerns with [California Public Resources Code] Section 30242's requirement that lands suitable for agricultural use not be converted to nonagricultural uses except in limited circumstances.

31. In January 2022, a lawsuit was filed to challenge the 2021 ROD. (2022 Suit.) The Nimans were not parties to that lawsuit. *Resource Renewal Institute v. National Park Service* (N.D. Cal. No. 3:22-cv-145).

32. In January 2025, all of the ranchers in the Seashore except the Nimans and one other family (Departing Ranchers) executed private, confidential agreements with The Nature Conservancy to leave the Seashore by 2026 in exchange for consideration specified in the agreements. This suit does not challenge those agreements.

33. On or about that same time, NPS also entered into an agreement with the parties to the 2022 Suit (which did not include the Nimans) to settle that litigation. (2025 NPS Settlement.) That settlement contemplated NPS issuing a new decision to replace the 2021 ROD.

34. The 2025 NPS Settlement was not entered as a consent decree or other order of any court.

35. NPS approved the new decision contemplated in the 2025 NPS Settlement on January 6, 2025. (2025 ROD.) The 2025 ROD replaced the 2021 ROD.

36. NPS did not seek or obtain the California Coastal Commission's concurrence under the Coastal Zone Management Act for the 2025 ROD.

37. The 2025 ROD decided to redesignate the lands ranched by the Departing Ranchers in the Pastoral Zone as a new "Scenic Landscape" zone where ranching or other agricultural activities would not be allowed.

38. The 2025 ROD did not propose to offer the lands ranched by the Departing Ranchers for lease as authorized by 16 U.S.C. § 459c-5(a).

COMPLAINT

39. The 2025 ROD did not select any of the alternatives considered in the 2020 EIS.

40. NPS did not conduct any further environmental review under the National Environmental Policy Act in support of the 2025 ROD.

41. NPS did not study the alternative of leasing the lands formerly ranched by the Departing Ranchers to others for continued agricultural or ranching operations, even though that alternative is authorized by 16 U.S.C. § 459c-5(a), and consistent with Congressional purpose.

42. NPS did not offer any opportunity for general public comment, or for comment by the Nimans in particular, or publish it as rulemaking in the Federal Register, before issuing the 2025 ROD.

43. The 2025 ROD affects the Nimans' interests. The 2025 ROD will only allow the Nimans to continue operating if they enter into new "Ranch Operating Agreements" (ROAs) that are required to contain restrictions that the Nimans were not consulted on and to which they object. For example, the ROAs are required to contain restrictions on the number of animals at levels that will make continued ranching economically difficult if not entirely nonviable. The ROAs are also required to contain restrictions, including on composting and cover cropping, that will make regenerative agriculture practices such as those practiced by the Nimans (or that they wish to practice) difficult if not entirely impossible.

44. The 2025 ROD also contains no real management plan for tule elk in Point Reyes. Tule elk present resource conflicts with cattle, including conflicts over fencing, water, forage, and diseases carried by the elk and transmissible to cattle, which have been largely managed in Point Reyes by keeping the elk out of the pastoral zone. But the 2025 ROD now proposes no meaningful restrictions or management measures for tule elk in the ranching areas of Point Reyes. If ranching is to survive in the Seashore, and on the Nimans' ranch, tule elk need to be properly managed.

### Administrative Procedure Act

45. Pursuant to the Administrative Procedure Act, a court must set aside agency action that: (a) fails to meet statutory, procedural, or constitutional requirements, or (b) is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A)-(D).

46. Section 706(1) of the Administrative Procedure Act authorizes a court to "compel agency action unlawfully withheld or unreasonably delayed".

47. Section 704 of the Administrative Procedure Act states that "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704.

48. Section 702 of the Administrative Procedure Act provides a federal law cause of action to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action". 5 U.S.C. § 702.

49. Plaintiffs are entitled to relief under the Administrative Procedure Act as follows.

## CAUSES OF ACTION

**COUNT 1: VIOLATION OF NEPA AND THE APA (INADEQUATE CONSIDERATION OF RANCHING ALTERNATIVES)**

50. Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1 - 49 of this complaint.

51. The National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq.*, declares, among other things, "a national policy which will encourage productive and enjoyable harmony between man and his environment," §4321.

52. NEPA requires a "detailed statement" (now referred to as an "environmental impact statement" or "EIS") to be prepared for "major Federal actions significantly affecting the quality of the **human environment**". 42 U.S.C. § 4332(2)(C) (emphasis added). The EIS must include discussion of "a reasonable range of alternatives to the proposed agency action". 42 U.S.C. § 4332(2)(C)(iii). The Park Service's actions complained of in this complaint constitute major Federal actions significantly affecting the quality of the human environment, but the Park Service did not prepare an adequate environmental impact statement, including analysis of a reasonable range of alternatives.

53. The 2025 ROD is a major federal action significantly affecting the quality of the human environment, including because it significantly changes the land uses humans have made in Point Reyes for nearly 200 years, which will have significant and negative consequences for the

human and natural environment of Point Reyes and beyond. The removal of most grazing in the pastoral zone also changes the human environment for the many thousands of Seashore visitors annually, and for the Nimans, who benefit from and enjoy the presence of grazing in the Pastoral Zone of the Seashore.

54. "[W]here changed circumstances affect the factors relevant to the development and evaluation of alternatives," NEPA requires that the federal agency "must account for such change in the alternatives it considers." *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1021 (9th Cir. 2009).

55. The decision by the Departing Ranchers to voluntarily cease their operations is a change in circumstances relevant to the development and evaluation of alternatives for the Seashore. Congress authorized the Secretary of Interior to lease the Seashore first to the ranchers who were there when the Seashore was created, including the Departing Ranchers, but also authorized the Secretary of Interior to lease the Seashore to others should those ranchers opt out. 16 U.S.C. § 459c-5(a). The Departing Ranchers have now opted out. The Secretary of Interior is now authorized by statute to lease those lands to others (which could include Plaintiffs, who would be interested in leasing at least some of those lands). But NPS did not consider the reasonable—and Congressionally authorized—alternative of leasing those lands to others, in the 2020 EIS, the 2025 ROD, or anywhere else. NPS also did not consider leasing those lands in such a way as to allow the sustainable, regenerative ranching practices Plaintiffs wish to practice and wish to see practiced on Point Reyes.

56. NPS's inclusion of restrictions on Plaintiffs' existing ranching operations will effectively end ranching in Point Reyes by making ranching uneconomic. In authorizing continued ranching in Point Reyes, Congress did not intend for Defendants to do so in a way that will effectively end ranching.

57. NPS's omission, in the 2025 ROD, of any study of the reasonable and Congressionally authorized alternative of leasing the lands of the Departing Ranchers to others, and so as to allow the sustainable, regenerative, economically viable ranching practices Plaintiffs wish to practice and wish to see practiced on Point Reyes, violated NEPA and is therefore contrary to law and arbitrary and capricious and an abuse of discretion under the Section 706(2) of the APA.

58.     The 2025 ROD should be set aside as it pertains to Point Reyes.

**COUNT 2: VIOLATION OF PARK SERVICE REGULATIONS (FAILURE TO UNDERTAKE NOTICE-AND-COMMENT RULEMAKING FOR 2025 ROD)**

59.     Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1 - 49 of this complaint.

60.     "In 1983, the NPS revamped its regulations and added a new provision to require notice-and-comment procedures before any 'highly controversial' closure or opening of NPS land or before any such action that would have a major impact on visitor-use patterns. Specifically, this provision required a notice-and-comment procedure before 'a closure, designation, use or activity restriction or condition, or the termination or relaxation of such, which is of a nature, magnitude and duration that will result in a significant alteration in the public use pattern of the park area ... or is of a highly controversial nature.' 36 C.F.R. 1.5(b)." *United States v. Barley*, 405 F.Supp.2d 1121, 1124 (N.D. Cal. 2005).

61.     The 2025 ROD is highly controversial.

62.     The 2025 ROD contains a closure, designation, use or activity restriction, or the termination or relaxation of such, including the closure of historic ranching and agricultural lands to those uses.

63.     The 2025 ROD will result in a significant alteration in the public use pattern of Point Reyes.

64.     Defendants did not conduct any notice-and-comment procedures, such as publishing a rulemaking in the Federal Register, before adopting the 2025 ROD.

65.     Defendants' failure to follow the procedures required by law before adopting the 2025 ROD was arbitrary, capricious, or otherwise not in accordance with the law.

66.     The 2025 ROD should be set aside as it pertains to Point Reyes.

**COUNT 3: VIOLATION OF 1976 TULE ELK LAW AND APA**

67.     Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1 - 49 of this complaint.

68.     The 1976 tule elk law, Pub. L. 94-389, authorized the reintroduction of tule elk into

Point Reyes under certain conditions.

69. Many commenters during the EIS process urged Defendants to adopt a robust management plan for the tule elk in Point Reyes that protects the health of the elk while avoiding conflicts with farmers and ranchers.

70. Section 2 of that law requires that tule elk herds in California be managed for their "preservation" and "consistent with Federal law."

71. NPS currently has no plan for how to manage tule elk to ensure their preservation. To date, NPS has allowed tule elk, which currently have no natural predators in Point Reyes, to suffer through unnatural and cruel boom-and-bust population cycles. The tule elk in Point Reyes are also known to be infected with Johnes disease, which is fatal and which can be transmitted to cattle (potentially including those owned by the Nimans). NPS has no plan for how to manage tule elk at sustainable and disease-free levels in Point Reyes.

72. Federal common law prohibits the federal government from creating a public nuisance, including "the keeping of diseased animals" and the allowance of passage by wild animals through federal facilities in a manner that causes damage to others. *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 768, 771 (7th Cir. 2011); *National Sea Clammers Ass'n v. City of New York* (3d Cir. 1980) 616 F.2d 1222, 1233–1235, *vacated sub nom on preemption grounds not applicable here, Middlesex County Sewerage Authority v. National Sea Clammers Ass'n* (1981) 453 U.S. 1.

73. Failing to manage wild animals, including those carrying disease, would also be a nuisance under California law and under Marin County law.

74. NPS's failure to create a management plan to manage the tule elk, including tule elk known to be diseased, so as to prevent damage to others, including the Nimans' cattle herds, is a public nuisance.

75. The Court should compel NPS to develop a management plan for tule elk to prevent nuisance and ensure their preservation as required by the 1976 tule elk law, under Section 706(1) of the APA.

76. Section 3 of the 1976 tule elk law requires the Secretary of the Interior, by March 1 of

each year, to submit a report to Congress on the estimated size and condition of the various tule elk herds in California and the nature and condition of their respective habitats. Those reports must include the Secretary's recommendations as to what Federal actions, if any, should be taken in order to preserve the tule elk herds at the then-existing level or such other level as may be determined from time to time by the State of California.

77. The Secretary of the Interior has not submitted annual reports each year as required by Section 3. Plaintiffs have been able to locate only two such reports, the last of which was submitted in 1992.

78. The 2025 ROD's decisions with respect to tule elk are not based on the Secretary's recommendations as to what Federal actions, if any, should be taken in order to preserve the tule elk herds at the then-existing level or such other level as may be determined from time to time by the State of California.

79. The 2025 ROD's decisions with respect to tule elk are arbitrary and capricious and should be set aside, under Section 706(2) of the APA.

80. The 2025 ROD should be set aside as it pertains to Point Reyes.

**COUNT 4: VIOLATION OF COASTAL ZONE MANAGEMENT ACT AND APA**

81. Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1 - 49 of this complaint.

82. The Coastal Zone Management Act, 16 U.S.C. § 1456(c)(1)(A), requires that "Each Federal agency activity within or outside the coastal zone that affects any land or water use or natural resource of the coastal zone shall be carried out in a manner which is consistent to the maximum extent practicable with the enforceable policies of approved State management programs." Federal agencies carrying out activities regulated by the Coastal Zone Management Act must "provide a consistency determination to the relevant State agency designated under section 1455(d)(6) of this title at the earliest practicable time, but in no case later than 90 days before final approval of the Federal activity unless both the Federal agency and the State agency agree to a different schedule." 16 U.S.C. § 1456(c)(1)(C).

83. The 2025 ROD is a Federal agency activity outside California's coastal zone that

affects land or water uses or natural resources within California's coastal zone. Specifically, the 2025 ROD affects agricultural land uses within California's coastal zone, as the California Coastal Commission found with respect to the 2021 ROD.

84. The California Coastal Act and the Marin County Local Coastal Program are the enforceable policies of approved State management programs with respect to the affected portion of California's coastal zone.

85. The 2025 ROD is not consistent to the maximum extent practicable with those enforceable policies, including the agricultural-protection-policies cited by the Coastal Commission in its review of the 2021 ROD.

86. The 2025 ROD's inconsistency harms Plaintiffs' interests in ensuring that agriculture is protected not just in Point Reyes but in the surrounding lands of California's Coastal Zone in Marin County as well.

87. The California Coastal Commission is the relevant State agency for purposes of the Coastal Zone Management Act for the 2025 ROD.

88. Defendants did not provide a consistency determination to the California Coastal Commission at least 90 days in advance. Defendants and the California Coastal Commission did not agree to a different schedule. Defendants kept the 2025 ROD secret until it was publicly released.

89. The 2025 ROD is arbitrary and capricious under Section 706(2) of the APA, because it was made without first complying with the Coastal Zone Management Act.

90. The 2025 ROD should be set aside as it pertains to Point Reyes.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully request that this court:

1. Set aside the 2025 ROD as it pertains to Point Reyes;
2. Order Defendants to analyze the alternative of leasing the lands in Point Reyes used by the Departing Ranchers to other farmers and ranchers, on conditions that allow for economically and environmentally sustainable farming and ranching operations;
3. Order Defendants to develop a management plan for tule elk that ensures the preservation of the tule elk and the prevention of nuisance;

4. Award Plaintiffs their costs and attorneys fees; and

5. Any other relief as the Court may award.

DATED: February 25, 2025

BRISCOE IVESTER & BAZEL LLP

By: _____
Peter Prows
Attorneys for Plaintiffs
NICOLETTE HAHN NIMAN, and WILLIAM NIMAN